IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 8, 2021

**STATE OF TENNESSEE v. SHAROD WINFORD MOORE**

**Appeal from the Circuit Court for Marshall County**
**No. 17-CR-55, 13-CR-6    M. Wyatt Burk, Judge**

_____

**No. M2020-00879-CCA-R3-CD**

_____

The Defendant, Sharod Winford Moore, was convicted by a jury of first degree premeditated murder and sentenced to life imprisonment. In the first direct appeal, this court found that the evidence was sufficient to sustain the conviction but that the Defendant waived all other issues for failure to file a timely motion for new trial. The Defendant was subsequently granted a delayed appeal. He now argues that (1) the trial court erred in allowing the State to present unfairly prejudicial evidence of his alleged gang membership, (2) the State engaged in prosecutorial misconduct by making inflammatory and prejudicial remarks about his alleged gang membership in closing argument, (3) the trial court erred in not allowing evidence of the victim's propensity for intoxication and violence, and (4) the trial court erred in determining that a State's intellectually disabled witness was competent to testify. We affirm the conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P. J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Garrett D. Haynes, Shelbyville, Tennessee, (on appeal), and Melissa Lee Thomas, Fayetteville, Tennessee (at trial), for the appellant, Sharod Winford Moore.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Robert James Carter, District Attorney General; and Weakley E. Barnard and Michael David Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

In 2014, the Defendant was convicted of the January 29, 2011 first degree premeditated murder of his mother's boyfriend, Mr. Ronald Shelton. The State's key witness at trial was a co-defendant, Mr. Jason McCollum, who was not tried with the Defendant. Mr. McCollum testified that, at the time of the murder, the Defendant was a high-ranking member of the Vice Lords street gang, which Mr. McCollum had quit approximately a year earlier. Mr. McCollum stated that during the period in which he was active with the gang, he served as the chief of security. As such, he was required to know who was and was not a member of the gang and who posed a potential threat to the gang. He was also responsible for ensuring the physical safety of higher-ranking gang members by fighting with individuals who posed a threat to those members.

Mr. McCollum testified that he was a "conservative" Vice Lord, which meant "governed by strict force." The Defendant was not a conservative Vice Lord but an "unknown Vice Lord," or one who did not openly advertise his gang membership in order to keep the "element of surprise." Mr. McCollum stated that the Defendant was a "five star elite," a higher rank than Mr. McCollum. According to Mr. McCollum, gang members who answered to the Defendant had to do what he directed or face the consequences. He implied that the consequences could be severe, testifying that there were "a lot of possibilities, but it wouldn't be good."

Mr. McCollum compared his role as chief of security to a member of the secret service assigned to protect the President and the Defendant's role as a five star elite to the President. He further testified, however, that he had no responsibility to protect the Defendant because the Defendant was not a conservative Vice Lord. Moreover, when asked what his job was with respect to any orders issued by the Defendant, he replied, "Nothing." He said he had never worked with the Defendant and never socialized with him but was well aware of the Defendant's role within the gang. He stated that the Defendant knew where Mr. McCollum lived because the Defendant had once given him a ride home from the store.

Mr. McCollum testified that the Defendant called him on the night of the murder to tell him that he was coming to Mr. McCollum's home and that he was going to kill the victim because the victim had put his hands on the Defendant's mother for the last time. Mr. McCollum said he knew what the Defendant was talking about because he was familiar with the situation. Ten or fifteen minutes later, the Defendant, dressed in black and carrying an item in a plastic garbage bag, showed up at Mr. McCollum's Lewisburg apartment. Mr. McCollum let the Defendant inside and was leading him into Mr.

McCollum's son's bedroom when he noticed the look on his son's face, turned, and saw that the Defendant had pulled a gun on Mr. McCollum. The Defendant said, "Bruh, you're going to take your a** over here and get this m*****f***** to open this door." Mr. McCollum explained that he and the victim, his nearby neighbor, were friendly with each other and that he interpreted the Defendant's statement as an order to go to the victim's apartment to try to lure him to the door.

Mr. McCollum testified that he put his hands up and walked to the victim's apartment with the Defendant following behind him. When they reached the victim's apartment, the Defendant stood in the shadows to the side of the door while Mr. McCollum knocked on the door. The victim opened the door, and Mr. McCollum asked the victim for a cigarette. Mr. McCollum said he was walking away from the victim's door after the victim gave him the cigarette when he heard three gunshots.

Mr. McCollum testified that he fled to his own apartment. When he reached the door, the Defendant, who was right behind him, pushed his way inside, put a gun to Mr. McCollum's head, and threatened to kill him and his family if Mr. McCollum did not help him coverup the crime or if Mr. McCollum told anyone what had happened. The Defendant then asked him for some mustard, telling him that mustard was supposed to remove gunshot residue. The Defendant rubbed the mustard on his hands and arms, washed, and repeated the process. Afterwards, the Defendant changed into the fresh clothes that he had brought with him and gave his worn clothing to Mr. McCollum with instructions to dispose of the clothing later.

Mr. McCollum testified that the Defendant next went into a bedroom of the home where Mr. McCollum's mother, fiancée, and son were gathered. The Defendant sat on a futon and talked with Mr. McCollum's mother as if nothing had happened. The Defendant remained in the apartment all night, leaving shortly after 6:00 a.m. the next morning because that was when the shifts changed at the police department. Before the Defendant left, he gave Mr. McCollum his gun to hold until he sent someone to retrieve it.

Mr. McCollum testified that he disposed of the Defendant's clothing by going with his fiancée in a borrowed car to a wooded area and setting it on fire with lighter fluid. Later that same day, the Defendant and a man nicknamed "Pookie" came to Mr. McCollum's apartment. To Mr. McCollum's knowledge, Pookie was also a member of the Vice Lords gang. The Defendant asked Mr. McCollum if he had done what he told him to do, and Mr. McCollum replied that he had. The Defendant told him that he would send Pookie back for the gun, and the Defendant and Pookie left. The following day, Pookie came alone to his apartment to retrieve the gun.

Mr. McCollum testified that he eventually moved to a different house in Lewisburg, where the Defendant one day paid him a surprise visit. He did not know how the Defendant learned where he lived. The Defendant came into the house and frightened Mr. McCollum by looking at him in a hard manner without saying anything other than that the Defendant was going "to holler" at Mr. McCollum and would let him know. The Defendant left, and Mr. McCollum did not hear from him again. A short time later, however, another man showed up at the house and threatened Mr. McCollum because he had heard that Mr. McCollum planned to talk about the Defendant.

Mr. McCollum testified that he initially kept quiet because he feared he would be killed if word got back to the Defendant that he had talked to anyone, but he eventually went to the police in August 2012. He stated that he had no criminal charges pending against him at the time he gave his statement to police, but at the time of the Defendant's trial, he was facing charges in connection with the case. He denied that he had been promised anything in exchange for his testimony against the Defendant and adamantly denied that he shot the victim.

On cross-examination, Mr. McCollum acknowledged that he was charged with first degree murder and conspiracy to commit first degree murder in connection with the victim's murder and arson and with accessory after the fact in a separate case in which his wife was charged with the first degree murder of another man. He admitted that he spoke with officers about the other case at the time he gave his statement about the victim's murder. He further acknowledged that he had, in the past, told both his mother and his brother that he had killed the victim. He said he explained to both his mother and his brother that he made those statements because he felt powerless to stop the killing and terrible about his involvement.

Other State witnesses included a neighbor of the victim, Mr. Clifford Watkins, who testified that he heard gunshots, looked out, and saw Mr. McCollum and a second man running from the victim's apartment, and witnesses, including Mr. McCollum's mother, who placed the Defendant in Mr. McCollum's company near the victim's apartment around the time of the shooting. Mr. McCollum's mother additionally testified that she saw the Defendant and Mr. McCollum rubbing something yellow on their hands and arms in the apartment after they returned. The State also introduced evidence that investigators eliminated robbery as a motive and determined that the fatal shots, which shattered the glass in the victim's apartment door, were fired by someone standing outside the apartment.

Among the defense witnesses was Mr. Jeremy Scott Matthews, Mr. McCollum's half-brother who had been raised by an adoptive family. Mr. Matthews testified that Mr. McCollum told him several months after the murder that he had shot the victim by firing at an angle through the victim's apartment door. In later conversations, however, Mr.

McCollum told Mr. Matthews that he had not shot the victim but felt responsible because he had been present with the Defendant when the shooting occurred.

On cross-examination, Mr. Matthews testified that he had lived for approximately one year with his biological mother and Mr. McCollum. He was aware that Mr. McCollum was a member of the Vice Lords gang. When he lived with Mr. McCollum in the same apartment, he saw the Defendant at the apartment participating in gang meetings, issuing orders, displaying gang signs, and engaging in gang handshakes. Mr. Matthews agreed that Mr. McCollum was a cowardly person and an alcoholic and that Mr. McCollum was drinking alcohol each time he talked to him about the murder. He said that after Mr. McCollum initially told him that he had shot the victim, Mr. McCollum told him on a subsequent occasion that the Defendant shot the victim. On that latter occasion, Mr. McCollum broke down in tears as he divulged that the Defendant had ordered "a hit" on the victim and that Mr. McCollum's role had been to exploit his friendship with the victim to persuade the victim to answer the door.

Mr. Matthews testified that before Mr. McCollum went to the police, he told Mr. Matthews that he had received a visit from someone. He agreed that Mr. McCollum appeared very nervous after the visit. He testified that he accompanied Mr. McCollum to the police station and that Mr. McCollum was so frightened that day that he was visibly shaking. On redirect examination, he acknowledged that Mr. McCollum's wife had already been arrested by that time. He declined to speculate whether it was her arrest rather than the visitor that caused Mr. McCollum's fear.

This court affirmed the Defendant's conviction but determined that all issues raised by the Defendant other than the sufficiency of the evidence were waived due to the Defendant's untimely filed motion for new trial. *State v. Sharod Winford Moore*, No. M2015-00663-CCA-R3-CD, 2016 WL 3610438, at *1 (Tenn. Crim. App. June 28, 2016), *perm. app. denied* (Tenn. Nov. 17, 2016). The Defendant then filed a timely petition for post-conviction relief in which he alleged, among other things, that he received ineffective assistance of counsel due to counsel's failure to timely file the motion for new trial. On November 6, 2017, the post-conviction court entered an order granting the Defendant a delayed appeal. In the order, the court limited the new appeal to the issues that had not been resolved by this court on direct appeal and stated that it was unnecessary for the Defendant to file a new motion for new trial. The court dismissed the remainder of the Defendant's post-conviction claims.

On appeal of the judgment of the post-conviction court, this court concluded that the post-conviction court failed to follow the proper procedures set forth in Tennessee Code Annotated section 40-30-113(a)(3) and Rule 28, section (9)(D)(1)(b)(i) of the Rules of the Tennessee Supreme Court by not allowing the Defendant to file a new motion for new trial

within thirty days and not staying the original petition for post-conviction relief until the completion of the delayed appeal. *Sharod Winford Moore v. State*, No. M2017-02314-CCA-R3-PC, 2019 WL 643575, at *4 (Tenn. Crim. App. Feb. 15, 2019). This court, therefore, reversed and vacated the post-conviction's order and remanded the case for further proceedings consistent with our opinion.

The Defendant subsequently filed his new motion for a new trial. Following a hearing, the trial court entered an order denying the motion. The Defendant filed a timely notice of appeal to this court.

## ANALYSIS

### I. Evidence of Defendant's Gang Membership

The Defendant contends that the trial court erred in allowing the State to present evidence that he was an alleged member of the Vice Lords gang. He argues that the evidence had low probative value, was unfairly prejudicial, and constituted impermissible character evidence.

The record reflects that defense counsel filed a motion in limine to exclude any "gang membership testimony" on the basis that it was not relevant to the crime. In the alternative, defense counsel requested that the trial court limit testimony about gang membership to those witnesses with actual knowledge. At the pretrial hearing on the motion, defense counsel argued that the Defendant's alleged gang membership was irrelevant because the murder had nothing to do with the Vice Lords gang, as the State's theory was that the Defendant killed the victim in retaliation for his treatment of the Defendant's mother. The prosecutor responded that evidence of the gang membership was relevant to show why the Defendant would have trusted Mr. McCollum, how the Defendant knew where Mr. McCollum lived, and why Mr. McCollum agreed to participate in the crime.

At the conclusion of the hearing, the trial court granted the motion in limine to the extent of excluding any hearsay evidence of the involvement of either the Defendant or Mr. McCollum in the Vice Lords gang. The court denied the motion with respect to non-hearsay evidence of the Defendant's and Mr. McCollum's gang membership, finding that the evidence was relevant and admissible for the reasons cited by the prosecutor: to show the Defendant's relationship with Mr. McCollum, to demonstrate the Defendant's prior knowledge of Mr. McCollum's living arrangements, and to provide an explanation for Mr. McCollum's willingness to participate in the crime.

- 6 -

On appeal, the Defendant first argues that the gang-related evidence should have been excluded under Rule 403 as unfairly prejudicial. Rule 403 of the Tennessee Rules of Evidence provides that relevant evidence may be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The Defendant argues that the gang-related evidence, in particular Mr. McCollum's testimony about the hierarchy and power structure of the gang, went far beyond the limited purposes cited by the State at the pretrial hearing and served no other purpose than to frighten the jurors and remind them that the Defendant was a gang member.

The Defendant asserts that the testimony should have been limited to the fact that he and Mr. McCollum were members of the same gang. In support, he cites *State v. Jeremy Reynolds*, No. E2018-01732-CCA-R3-CD, 2020 WL 3412275, at \*25-26 (Tenn. Crim. App. June 22, 2020), *perm. app. granted* (Tenn. Nov. 1, 2020), in which this court noted that, although evidence of a defendant's gang membership was relevant and admissible to show his connection to the murder weapon, a police officer's expert testimony about gangs "could have been better tailored to minimize the danger that the jury would be distracted and confused by extraneous information." The Defendant points out that Mr. McCollum testified that he was not required to act on orders of the Defendant and that the Defendant knew where he lived not because they were members of the same gang but because the Defendant had once given him a ride home from the store. He, thus, contends that the additional testimony about the gang hierarchy and gang membership was unnecessary and unfairly prejudicial.

As a general rule, the admissibility of evidence rests within the sound discretion of the trial court, which will not be overturned on appeal unless the record shows a clear abuse of discretion. *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015) (citation omitted). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Id.* (citations omitted).

We conclude that the trial court did not abuse its discretion in admitting the evidence. Although Mr. McCollum testified that he was not obligated to provide security to the Defendant and that his responsibility with respect to any orders of the Defendant was "nothing," he also compared himself and the Defendant to a member of the secret service and the President of the United States, respectively. Mr. McCollum additionally testified that he was aware of the Defendant's high rank in the gang, knew of the severe consequences that followed a failure to do what the Defendant directed, and was afraid of what would happen to him and his family if he did not comply with the Defendant's orders.

Mr. McCollum's description of the gang hierarchy was relevant to show not only why he felt compelled to participate in the murder but also why he waited so long before he went to the police. Further, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. On this latter point, we note that Mr. McCollum's explanatory testimony about the gang hierarchy and his and the Defendant's roles within the gang comprises only a few pages of a voluminous trial transcript, unlike in *Reynolds*, where a police investigator testified at length about the history of the Gangster Disciples street gang, the signs and symbols used by its members, and how and why the defendant in that case had been "validated" as a gang member on the Chattanooga Police Department's gang validation form. *Id.* at *13-15, 25.

The Defendant next argues that the trial court should have excluded the gang evidence as impermissible character evidence under Rule 404 (b) of the Tennessee Rules of Evidence. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). This is to prevent the jury from convicting the defendant of a crime based on propensity rather than proof the defendant committed an offense. *State v. Garrett*, 331 S.W.3d 392, 402 (Tenn. 2011) (citing *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)). In evaluating the admissibility of evidence regarding prior bad acts, the trial court must adhere to the following procedure:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

The Defendant concedes that defense counsel did not request a 404 (b) hearing, but argues that the trial court's failure to exclude the inadmissible character evidence was plain error. To be entitled to relief under the doctrine of plain error, the Defendant has the burden to establish the presence of the following five factors: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020) (citations omitted). "Moreover,

the error must have been of 'sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008)).

We agree with the State that the Defendant cannot show the presence of the required five factors for plain error review, as he cannot show that a clear and unequivocal rule of law was breached, that a substantial right of his was adversely affected, or that consideration of the error is necessary to do substantial justice. The Defendant is not entitled to relief on the basis of this issue.

## II. Prosecutorial Misconduct

The Defendant contends that the prosecutor made improper, inflammatory and prejudicial comments in closing argument about the Defendant's involvement in the gang. He complains about the prosecutor's reference to gang "hits," the prosecutor's comparison of the Defendant's directing Mr. McCollum's participation in the murder to a military commander issuing orders, the prosecutor's stating that he bet the jurors questioned their daughters closely about the men they were dating because they had learned the "startling information" that there were Vice Lords in their town, and the prosecutor's suggestion that the Defendant's status as a high ranking gang member provided a motive for his retaliation against the victim because the Defendant would not be able to maintain his authority if he let the victim's treatment of his mother go unpunished.

The Defendant argues that the above comments were designed to frighten the jury into convicting him based on his status as a gang member rather than on the proof. He further argues that the comments were egregious enough to warrant a new trial. The State responds by arguing that the Defendant has waived this issue by not raising it in his motion for new trial.

The record reflects that defense counsel cited the above comments in the hearing on the motion for new trial, but only in the context of his argument that the trial court erred in admitting the gang-related evidence. With respect to the issue of prosecutorial misconduct, defense counsel argued only that the prosecutor's closing argument was improper because it misstated the law regarding reasonable doubt. We, therefore, agree with the State that the issue is waived on appeal. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."). The Defendant is not entitled to relief on the basis of this issue.

### III. Victim's Propensity for Violence and Intoxication

The Defendant next contends that the trial court erred by not allowing him to present evidence of the victim's "propensity to become intoxicated and fight with neighbors, resulting in numerous arrests." The record reflects that defense counsel first attempted to bring up the victim's alleged bad character, specifically, his prior violence toward the Defendant's mother, during opening statement. The prosecutor objected, and the trial court instructed defense counsel to refrain from discussing it any further in opening. After opening statements, defense counsel argued that she should be allowed to present evidence of the victim's habit of becoming intoxicated and belligerent and starting fights with neighbors. The trial court responded that it could not rule on the issue until the State presented its proof. Thereafter, defense counsel made several proffers regarding the victim's propensity for drunkenness and violence to show that he had assaulted neighbors while drunk, had been arrested for public intoxication, and had been accused of rape.

On appeal, the Defendant, apparently conceding that the evidence was otherwise inadmissible, argues that the State "opened the door" to its admission by putting on evidence of the victim's good character through the testimony of a patrol officer who described the victim as a polite man who was friendly to the police. Our review of the record, however, reveals that it was defense counsel, rather than the prosecutor, who elicited the testimony from the officer that the victim was friendly and had a good relationship with the police. On direct examination, the officer testified only that she knew who the victim was because she regularly patrolled the area, that she was aware that he lived alone, and that she called her supervisor for a welfare check after she responded to the report of a possible vandalism at the victim's apartment and discovered what appeared to be bullet holes in the shattered glass above his door. Moreover, her cross-examination testimony about the victim's character was limited to a few brief sentences, made in response to defense counsel's question as to how she knew the victim, in which she stated that the victim was often sitting on his front porch, that he was friendly and liked to laugh, and that he liked the police.

Regardless, the Defendant cannot show that the trial court erred in excluding the evidence. Generally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion[.]" Tenn. R. Evid. 404(a); *see also* Tenn. R. Evid. 404(b). However, if a defendant raises a claim of self-defense, Tennessee Rule of Evidence 404(a)(2) "permits the defendant to offer proof of the victim's 'pertinent' character for violent behavior to help establish that the victim was the aggressor." Neil P. Cohen et al., *Tennessee Law of Evidence*, § 4.04[5][c] (6th ed. 2011).

As the trial court noted in its order overruling the motion for new trial, there was no evidence that the Defendant acted in self-defense or that the victim was aggressive to the Defendant. To the contrary, the evidence was that the victim was shot through the door of his apartment when he was home alone. The Defendant is not entitled to relief on the basis of this issue.

## IV. Competency of Witness

Lastly, the Defendant contends that the trial court abused its discretion in determining that Mr. Watkins, who had been found incompetent to stand trial in 1999 due to intellectual disability, was competent to testify. The Defendant argues that the witness made, at best, inconsistent statements about his ability to understand the difference between telling a lie and telling a truth during his voir dire by the trial court and by defense counsel.

Rule 601 of the Tennessee Rules of Evidence provides that "every person is presumed competent to be a witness except as otherwise provided in these rules or by statute." Tenn. R. Evid. 601. The list of persons who may be permitted to testify includes mentally incompetent individuals. Tenn. R. Evid. 601, Advisory Comm'n Cmt. Further, Rule 603 requires that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so." The determination of whether a witness is competent to testify is a discretionary decision of the trial court, which will not be overturned on appeal absent a clear abuse of discretion. *See State v. Nash*, 294 S.W.3d 541, 548 (Tenn. 2009) (citation omitted); *State v. Hallock,* 875 S.W.2d 285, 293 (Tenn. Crim. App. 1993).

We conclude that the trial court properly found the witness competent to testify. During the jury-out voir dire before his testimony, Mr. Clifford testified that he was forty years old, that he had obtained a regular high school diploma but could not read or write very well, and that he received disability based on his inability to read or write. When the trial court asked if he understood the difference between telling the truth and a lie, he responded that he thought so and that telling the truth meant not lying. Upon further questioning by the trial court, he agreed that he knew what it meant to lie and what it meant to tell the truth and that telling the truth was right and telling a lie was wrong. When asked by the prosecutor what would happen if he lied in court, he replied that he would "[g]et locked up."

The Defendant cites defense counsel's voir dire during a proffer that occurred after Mr. Watkins completed his trial testimony as proof that Mr. Watkins did not really understand the difference between telling the truth and telling a lie. The Defendant asserts

that the trial court should have conducted further voir dire of Mr. Watkins after that exchange and taken curative measures with respect to his testimony.

We respectfully disagree. Defense counsel's voir dire began with counsel reminding the witness that he was still under oath and asking him if he understood. Mr. Watkins responded that he did not understand what that part meant. However, when defense counsel replied that it meant he still had to tell the truth, Mr. Watkins responded "Yeah." The fact that the witness did not understand the meaning of the phrase "under oath" does not mean that he did not understand his responsibility to tell the truth or the act of swearing to testify truthfully. We find no error in the trial court's allowing the witness to testify and not taking any curative action regarding his testimony. As the State points out, the jury was able to hear and see the witness and form its own conclusions regarding his mental capacity and the weight to be afforded his testimony. The Defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE